IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DONALD BUCKNER, ) <br>     Plaintiff, ) <br> ) <br> v. ) <br> ) <br> E.I. DU PONT DE NEMOURS AND ) <br> AND COMPANY, et al., ) <br> ) <br>     Defendants ) <br> _____ ) <br> ) <br> AND RELATED CROSS-ACTION(S) ) <br> _____ ) | CV F 05-0156 AWI SMS <br><br> MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT WASHING'S, DEFENDANT AMERIPRIDE'S, AND DEFENDANT SPRINGFIELD'S MOTION FOR A DETERMINATION OF GOOD FAITH SETTLEMENT <br><br> [Documents #80, #83, & #87] |

  This action arises out of an accident in which Plaintiff Donald Bucker ("Buckner") was injured when his lab coat caught on fire, resulting in Buckner being severely burned.   Buckner sues the material maker, lab coat maker, and entities responsible for cleaning the lab coat, contending that they are partly responsible for the lab coat remaining on fire and Buckner's injuries.   This court has jurisdiction pursuant to 28 U.S.C. § 1367 because the parties are citizens of different states and over $75,000 is in controversy.   Pending before the court are three Defendants' motions for determination of good faith settlement.

**PROCEDURAL HISTORY**

  On December 5, 2004, Plaintiff Donald Buckner ("Buckner") filed a complaint in the Kern County Superior Court.  The complaint named E.I. du Pont de Nemours and Company ("E.I. du Pont"), VF Imagewear Inc., named in the complaint as Bulwark Protective Apparel ("VF Imagewear"), Ameripride Uniform Service ("Ameripride"), and Does 1 through 100 as

Defendants. The complaint alleged negligence, strict products liability, negligent misrepresentation, breach of express warranty, and breach of implied warranty. On February 3, 2005, Defendants removed this action to this court.

On February 15, 2006, VF Imagewear filed a cross claim against Ameripride and Springfield LLC. ("Springfield"). In the cross claim, VF Imagewear contends that it is not responsible for the events, happenings or damages mentioned the complaint. However, should VF Imagewear be held liable, said liability will be based on the primary or active negligence or fault of Ameripride and Springfield, and FV Imagewear would be entitled to indemnification. VF Imagewear's cross complaint requests declaratory relief, indemnity, and contribution.

On March 4, 2005, Ameripride filed a cross claim against VF Imagewear and E.I. du Pont. Ameripride's cross complaint requests declaratory relief, indemnification and contribution.

On March 25, 2005, Springfield filed a cross-complaint against VF Imagewear, E.I. du Pont, and Ameripride. Springfield requests declaratory relief, indemnification, and contribution.

On June 7, 2005, VF Imagewear and Ameripride dismissed their cross claims against each other.

On June 10, 2005, Ameripride dismissed its cross claim against E.I. du Pont.

On August 2, 2005, Plaintiff dismissed E.I. de Pont from this action.

On September 14, 2005, Buckner filed an amended complaint. The amended complaint names VF Imagewear, Ameripride, Springfield, Washing Systems LLC ("Washing") and SIZWE formally doing business as Washing Systems ("SIZWE") as Defendants. The amended complaint alleges negligence, strict products liability, negligent misrepresentation, breach of express warranty, and breach of implied warranty.

On October 19, 2005, Buckner dismissed SIZWE from this action.

On April 4, 2006, Springfield filed a motion for a determination of a good faith

2

settlement.  Springfield alleges that all Defendants believe Buckner is solely responsible for the accident.   However, Springfield has agreed to pay $100,000 to Buckner to settle Buckner's claims against Springfield.  Springfield seeks a finding that the settlement is in good faith and Springfield should be dismissed from all complaints, cross-claims, and counter-claims against it in this action.

On April 7, 2006, Washing filed a motion for a determination of good faith settlement. While Washing states that all Defendants agree Plaintiff is solely at fault for the accident, Washing has agreed to pay $100,000 to Buckner to settle all claims.  Washing seeks a finding that the settlement is in good faith and Washing should be dismissed from all complaints, cross-claims, and counter-claims against it in this action.

On April 13, 2006, Ameripride filed a motion for a determination of good faith settlement.   While Ameripride states all Defendants agree Plaintiff is solely at fault for the accident, Ameripride has agreed to pay Buckner $500,000.  Ameripride seeks a finding that the settlement is in good faith and Ameripride should be dismissed from all complaints, cross-claims, and counter-claims against it in this action.

On April 24, 2006, VF Imagewear filed an opposition to Springfield's motion.   VF Imagewear contends that Springfield's proposed settlement is not within the range of its potential liability.   VF Imagewear contends that if a jury finds any defect in the coat, both Springfield and VF Imagewear would be strictly liable as they are in the chain of distribution.   VF Imagewear contends that if there is a finding that VF Imagewear failed warn, it should be indemnified because Springfield failed to warn VF Imagewear.   VF Imagewear argues that if Springfield's motion is granted, VF Imagewear will be unable to obtain reimbursement for Springfield's percentage of fault.

On April 24, 2006, VF Imagewear filed an opposition to Ameripride's motion.   VF Imagewear contends that Ameripride's proposed settlement of $500,000 is not within the range of its potential liability.

On April 24, 2006, VF Imagewear filed an opposition to Washing's motion.   VF Imagewear contends that Washing's $100,000 proposed settlement is not within the range of its potential liability.

On April 28, 2006, Buckner filed replies to VF Imagewear's oppositions and statements in support of Springfield's, Ameripride's and Washing's motions for a determination of good faith settlement.

On May 1, 2006, Springfield, Ameripride, and Washing filed reply briefs.

On May 8, 2006, the court held a hearing.   After hearing oral arguments from the parties, the court took the pending motions under submission.

## FACTS

**A. Amended Complaint's Allegations**

The amended complaint alleges that on June 3, 2004, Buckner was working as a laboratory technician.  Buckner was involved in an incident where his lab coat ignited and Buckner was severely burned.  The amended complaint alleges that as a result of the manner in which the lab coat had been cleaned and/or maintained and also the manner in which it had been designed, constructed, manufactured, wholesaled, advertised, and sold, without inspection for defects, and as advertised to Buckner's employer, Buckner was severely injured.

The amended complaint alleges that Springfield was the manufacturer of the fabric that was used to make the lab coat Buckner was wearing and/or designed, manufactured, advertised, and introduced the lab coat which Buckner was wearing at the time of his injuries.

The amended complaint alleges that VF Imagewear designed, manufactured, advertised and introduced the lab coat that Buckner was wearing into the commercial market without inspection for defect.

The amended complaint alleges Ameripride ordered and purchased the lab coat, which Buckner was wearing, from VF Imagewear and then leased it to Buckner's employer, Kern Oil & Refining Co. ("Kern Oil").  The amended complaint alleges that Ameripride was responsible for

cleaning, laundering, repairing, and maintaining the lab coat.

The amended complaint alleges that Washing was in the business of consulting in the areas of the care, cleaning, and maintenance of industrial protective wear, including the Nomex lab coat that Plaintiff was wearing at the time he was injured. The amended complaint alleges that Ameripride subcontracted with Washing to provide cleaning services or to consult regarding these services. The amended complaint alleges Washing and Ameripride knew or should have known the methods and substances they were recommending and using were not effective in cleaning the garment and that as a result, the garment was less effective and less flame resistant.

The lab coat Buckner was wearing at the time of his injuries had been in service and had been utilized by Buckner for a period of in excess of one year. The lab coat was regularly serviced, cleaned, maintained, dry cleaned, washed and de-greased by Ameripride and/or Washing. The lab coat was designed and equipped with a five button front closure, and the buttons were either plastic, bone, or a similar hard material.

The amended complaint alleges that the lab coat was advertised and held out to be flame-resistant and that it would resist ignition and would not continue to burn when removed from the ignition source, and the garment purported to have an indefinite life cycle. The amended complaint alleges the Defendants' action created a dangerous condition regarding the coat's defects and these defects were known to or should have been know to Defendants. The amended complaint alleges that Defendants were negligent in failing to warn of the hazards and failing to provide appropriate and necessary safeguards for the user. The amended complaint alleges that Defendants falsely and negligently portrayed to the public that the lab coat was fire resistant and would resist ignition and not continue to burn when removed from an ignition source and the five button closure would allow rapid removal. The amended complaint alleges that Defendants placed the coat into the general stream of commerce and failed to mention the product's useful life and the effect of repeated washing or dry cleaning.

**B. Defendants' Facts**

A number of depositions have been taken in this action and substantial written discovery has been conducted. Defendants provide certain facts pertinent to the pending motions that have been elicited during discovery.

Buckner was a laboratory technician for Kern Oil. Kern Oil provided lab coats, that were comprised of Nomex, which is a flame resistant fabric. On June 3, 2004, Buckner was conducting a test on a gasoline sample. He was conducting two tests at the same time, one of which involved the use of an open flame. During this process, Buckner placed an air hose attached to the laboratory's compressed air system into the gasoline sample, contrary to the normal procedures for conducting tests. Buckner then turned on the valve for the compressed air, causing liquid gasoline to spill out of the bottle and onto the lab coat Buckner was wearing. The gasoline fumes and gasoline ignited because Buckner was next to the open flame. Buckner did not use the fire equipment in the laboratory and ran through an exterior door to a hose on the exterior of the building. The lab coat continued to burn until he extinguished it with water. Buckner experienced difficulty in his attempts to remove the coat. Buckner suffered severe burns.

Kern Oil allotted Buckner several lab coats to wear while he was in the lab. The lab coats were comprised of Nomex IIIA, which is a flame resistant fabric. The fibers for the material were manufactured by E.I. du Pont. These fibers were used to manufacture bulk Nomex fabric by Springfield, which sold the fabric to VF Imagewear. VF Imagewear designed and manufactured the lab coats. VF Imagewear sold some of the lab coats to Ameripride, which owned them and leased them to Kern Oil for use by its employees. Ameripride would launder the coats with chemicals and consulting services provided by Washing. As part of the arrangement between Kern Oil and Ameripride, Ameripride would come by the Kern Oil facility on a weekly basis to pick up items from the various departments, including the laboratory, to be laundered, and returned after the next laundering. Washing provided cleaning products to

Ameripride, which included washing detergent.  Washing also provided washing formulas and guidance to Ameripride regarding its laundering practices and procedures.

## LEGAL STANDARD

In diversity cases, such as this one, state law governs determinations of good faith settlements. <u>Federal Sav. and Loan Ins. Corp. v. Butler</u>, 904 F.2d 505, 510 (9th Cir. 1990); <u>Owen v. United States</u>, 713 F.2d 1461, 1464-1466 (9th Cir. 1983). California Code of Civil Procedure § 877 addresses the release of a joint tortfeasors:

> Where a release, dismissal with or without prejudice, or a covenant not to sue or not to enforce judgment is given in good faith before verdict or judgment to one or more of a number of tortfeasors claimed to be liable for the same tort . . ., it shall have the following effect:
>
> (a) It shall not discharge any other such party from liability unless its terms so provide, but it shall reduce the claims against the others in the amount stipulated by the release, the dismissal or the covenant, or in the amount of consideration paid for it whichever is the greater.
>
> (b) It shall discharge the party to whom it is given from all liability for any contribution to any other parties.

Cal. Civ. Pro. § 877.  The Ninth Circuit Court of Appeals has explained Section 877's effect:

> Section 877 applies to settlement made in good faith only.  Individuals not participating in the settlement are barred from seeking contribution only if the settling parties acted in good faith with respect to them.  Hence, good faith of the dismissal alone is not sufficient.  The dismissal must represent a settlement which is a good faith determination of relative liabilities.  Only in this situation are both policies behind § 877 – equity and settlement – furthered.

<u>Commercial Union Ins. Co. v. Ford Motor Co.</u>, 640 F.2d 210, 213 (9th Cir. 1981).

California Code of Civil Procedure § 877.6 provides the procedure for good faith settlements.  It reads in part:

> (a)(1) Any party to an action in which it is alleged that two or more parties are joint tortfeasors or co-obligors on a contract debt shall be entitled to a hearing on the issue of the good faith of a settlement entered into by the plaintiff or other claimant and one or more alleged tortfeasors or co-obligors . . . .
> (b) The issue of the good faith of a settlement may be determined by the court on the basis of affidavits served with the notice of hearing, and any counteraffidavits filed in response, or the court may, in its discretion, receive other evidence at the hearing.

7

> © A determination by the court that the settlement was made in good faith shall bar any other joint tortfeasor or co-obligor from any further claims against the settling tortfeasor or co-obligor for equitable comparative contribution, or partial or comparative indemnity, based on comparative negligence or comparative fault.
> (d) The party asserting the lack of good faith shall have the burden of proof on that issue.
> . . . .

Cal. Civ. Pro. 877.6

Sections 877 and 877.6 are designed to promote the equitable sharing of costs among the parties at fault, and to encourage settlement.  Tech-Bilt, Inc. v. Woodward-Clyde & Associates, 38 Cal.3d 488, 494-498 (1985); Mattco Forge, Inc. v. Arthur Young & Co., 38 Cal.App.4th 1337, 1349 (1995).  In addition, the offset provided for in section 877 assures that a plaintiff will not be enriched unjustly by a double recovery, collecting part of his total claim from one joint tortfeasor and all of his claim from another.  Wouldridge v. Zimmerman, 21 Cal.App.3d 656, 658 (1971).  Section 877.6(d)'s primary objective, like that of similar state statutes, is to encourage settlements. Tech-Bilt, 38 Cal.3d at 494.  However, it is also intended to complement the equitable goals underlying rights of contribution. Id.

To make an informed and intelligent decision about any settlement, the court must have sufficient information to understand who benefits from the proposed settlement.  "In other words, the . . . court must understand the size of the settlement pie, how the pie is sliced, and who is getting which slice." Oldham v. California Capital Fund, Inc., 109 Cal.App.4th 421, 432 (2003). As provided in Section 877.6(d), any party challenging the good faith of a proposed settlement bears the burden of proving that the settlement was entered into in bad faith.  To do so, the challenging party must "demonstrate, if he can, that the settlement is so far 'out of the ballpark', in relation to these factors as to be inconsistent with the equitable objectives of the statute." Tech-Bilt, 38 Cal.3d at 499-500.   A district court's good faith finding is one of "fact" and will be reversed "only upon a showing that it was clearly erroneous because of lack of evidentiary support or erroneous application of law." Owen v. United States, 713 F.2d 1461, 1466 (9th Cir. 1983); Power v. Union Pac. Railroad Co., 655 F.2d 1380, 1382-1383 (9th Cir.

1981)).

In <u>Tech-Bilt, Inc. v. Woodward-Clyde & Associates</u>, 38 Cal.3d 488 (1985), the California Supreme Court established factors for the court to consider when determining if a settlement is in good faith. The factors are: (1) A rough approximation of plaintiffs' total recovery and the settler's proportionate liability; (2) The amount paid in settlement; (3) The allocation of settlement proceeds among plaintiffs; (4) A recognition that a settlor should pay less in settlement than he would if he were found liable after trial; (5) The financial conditions and insurance policy limits of settling defendants; and (6) The existence of collusion, fraud or tortuous conduct aimed to injure non-settling defendants' interests. The California Supreme Court explained:

> The party asserting the lack of good faith . . . should be permitted to demonstrate, if he can, that the settlement is so far "out of the ballpark" in relation to these factors as to be inconsistent with the equitable objectives of the statute. Such a demonstration would establish that the proposed settlement was not a "settlement made in good faith" within the terms of section 877.6.

<u>Tech-Bilt</u>, 38 Cal.3d at 500-501. "Practical considerations" require that evaluation "be made on the basis of the information available at the time of settlement." <u>Id</u>. at 499.

**DISCUSSION**

Applying the <u>Tech-Bilt</u> factors, Springfield, Ameripride, and Washing contend that the settlements are in good faith. Buckner also argues the settlements are in good faith. VF Imagewear contends the settlements are not in good faith because the proposed settlements are not proportionate to the potential damage award Buckner could receive after trial.

**A. Rough Approximation of Plaintiff's Total Possible Recovery**

The parties appear to agree that Buckner's medical expenses are approximately $1,500,000 and continue. The paid medical expenses are in the neighborhood of $520,000, and the charged medical expenses are believed to be in excess of $1,000,000. The parties agree that if Buckner is able to prevail on all liability issues against Defendants, a gross recovery in the range of $5,000,000 or more is not unlikely. At the hearing, VF Imagewear stated it was possible

9

damages could even reach $10,000,000.

In its brief, VF Imagewear presumes that $5,000,000 is a rough approximation of what Buckner would obtain at trial. VF Imagewear claims that based on a verdict of $5,000,000, the settlements are not in good faith because they are not proportionate to $5,000,000 even if the court assumes comparative negligence of 50% by Buckner.

A plaintiff's requests for damages are not determinative in finding good faith. Horton v. Superior Court, 194 Cal.App.3d 727, 735-36 (1987). "Rather, the court is called upon to make a 'rough approximation' of what the plaintiff would actually recover." West v. Superior Court, 27 Cal.App.4th 1625, 1636 (1994). Several factors are relevant in this case to determine an approximation of what Buckner could receive at trial, including Buckner's damages, Buckner's comparative negligence, and the likelihood that Buckner will be able to show liability against each Defendant.

### *1. Damages*

Buckner's damages are catastrophic. Buckner's medical expenses are over $1,500,000. All parties appear to agree that Buckner may be able to prove total damages at trial over $5,000,000, and it is possible damages will reach $10,000,000. Thus, if Buckner can show liability, the approximation of Buckner's damages is very high.

### *2. Comparative Negligence*

All Defendants agree that Buckner is at least partly responsibly for his injuries. The evidence shows that Buckner performed a dangerous test in a manner not authorized by his employer. Buckner allowed his coat to become doused with gasoline and then Buckner came into close proximity with an open flame. Buckner did not use a safety fire shower near his work space nor other safety equipment in the lab. Based on the evidence currently before the court, it is likely that a trier of fact would find Buckner's comparative negligence for the accident between 50% to 100%.

### *3. Liability of Springfield*

Buckner's theory of liability against Springfield appears to be based on a theory that the lab coat did not perform as expected. Specifically, the lab coat ignited and did not extinguish as it was supposed to within two seconds of the ignition source being removed. Buckner's theory against Springfield also includes allegations that it failed to instruct consumers about proper cleaning techniques.

Springfield obtained Nomex fibers from the fiber manufacturer, E.I. du Pont, and wove the fibers into a flame resistant fabric. The evidence shows that the material created by Springfield was 100% Nomex IIIA, which is a blend of 93% Nomex, 5% Kevlar, and 2% P-140. The evidence shows this blend of materials is standard in the industry and does not affect the fire retardant qualities of the fabric. The fabric met all applicable government and industry standards. The fabric itself is inherently flame resistant; it is not covered by any fire resistant substance.

Springfield admits it did not provide warnings that laundering could reduce the fabric's fire resistant qualities. However, Springfield argues that proper laundering would not degrade the material's fire resistant qualities as the material is not covered with a fire resistant substance. In addition, Springfield only makes the material that was made into lab coats by VF Imagewear. Both VF Imagewear and E.I. du Pont provided appropriate care and laundering directions.

There is no evidence at this time that the fabric itself did not perform as it was supposed to. Evidence indicates that the lab coat burned because it had been doused with a highly flammable liquid – gasoline – and the gasoline was set on fire by a nearby open flame. The evidence does not support a finding that the lab coat would have continued to burn without the gasoline.

VF Imagewear contends that as the producer of the material in the "chain of distribution," Springfield could be held strictly liable to Plaintiff. The doctrine of strict liability in California provides that a manufacturer, distributor, or wholesale or retail dealer is strictly liable in tort

when an article he or she places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being. Anderson v. Owens-Corning Fiberglas Corp., 53 Cal.3d 987, 994 (1991). Three types of defect trigger a manufacturer's strict liability: (1) manufacturing defects; (2) design defects; and (3) "warning defects," i.e., inadequate warnings or failure to warn. Id. at 995. Multiple defendants in the chain of distribution of a single product are "jointly and severally liable to the plaintiff for the harm caused by that product" under a strict liability theory. Wilson v. John Crane, Inc., 81 Cal.App.4th 847, 852 (2000).[1]

Assuming VF Imagewear is correct and it is possible that Springfield may be held liable on a strict liability theory, VF Imagewear has not provided any evidence that a trier of fact will likely find Springfield liable on such a theory. As discussed above, there is no cited evidence that Springfield was responsibly for manufacturing defects in the cloth, design defects, or inadequate warnings. The evidence cited by the parties indicates the material acted as it was designed to do and adequate instructions regarding cleaning were provided. Thus, at this time, it appears Springfield's potential liability is slight.

### 4. *Liability of Ameripride and Washing*

Buckner's theory of liability against Ameripride and Washing appears to be that their conduct in cleaning the lab coat degraded the flame resistant capacity of the coat. Buckner alleges that this degradation caused or contributed to Buckner's injuries by allowing the coat to catch on fire.

---

[1] Springfield argues it would not be liable under this theory because it only provided a raw material. Under the raw material exception "component and raw material suppliers are not liable to ultimate consumers when the goods or material they supply are not inherently dangerous, they sell goods or material in bulk to a sophisticated buyer, the material is substantially changed during the manufacturing process and the supplier has a limited role in developing and designing the end product." Artiglio v. General Electric Co., 61 Cal.App.4th 830, 839 (1998). It is questionable whether this theory would absolve Springfield of strict liability because incorporating material into a lab coat does not appear to have substantially altered Springfield's product. However, it is unnecessary to resolve this issue because there is little evidence to show that Springfield could be held liable under a strict liability theory.

     VF Imagewear, the lab coat manufacturer, published technical information, known as RK-63, or the "Red Kap" bulletin, which provides instructions on how to properly care for Nomex lab coats. The source material for the bulletin came from I.E. du Point and another of VF Imagewear's suppliers of Nomex. I.E. du Pont has also disseminated certain documents relating to the laundering of Nomex garments, including its "Nomex Aramid Fiber Laundering Guide," containing its recommended procedures for laundering Nomex. This guide introduces "new, low-temperature detergent formulations" that resulted in improved washfastness of Nomex garments. The evidence before the court shows Ameripride laundered Nomex garments at its facility consistent with VF Imagewear's and I.E. du Pont's literature.

     Ameripride washed its customers' laundry in industrial washing machines using dry chemicals. Nomex garments were washed and dried only with other Nomex garments. Ameripride consulted with Washing regarding proper laundering. Washing confirmed that the washing formula utilized by Ameripride to launder the lab coats was appropriate for Nomex. Ameripride never received any complaint from Kern Oil regarding the cleanliness of the Nomex garments.

     Washing sold cleaning products to Ameripride for use in the laundering process, including detergents. As part of this arrangement, Washing provided technical support to Ameripride, including providing washing formulas for various "soil" classification and visiting the plant once a month. No problems with the Nomex garments and lab coats were ever reported to a technical representative from Washing.

     In its opposition, VF Imagewear cites to a letter written by Buckner's attorney, providing Buckner's theories on how the laundering could have resulted in damage to the lab coat. In the letter, Buckner's attorney discusses discovery showing that Ameripride, with respect to its laundering of Nomex, had problems with oil redeposition; laundered coats in wash loads of 1000 pounds; used inappropriate temperature for washing and drying; used improper chemicals, including bleach; and laundered the lab coats with items other than Nomex, including cotton.

In their reply, Ameripride offers evidence that deposition testimony by Ameripride's production manager, Robert Combs, negated every one of these theories.  Mr. Combs' testimony confirms that Ameripride utilizes a wash formula designed as Formula 4-P to lauder Nomex.  The Nomex garments were laundered in approximate 60 pound loads at a maximum temperature of 130 degrees Fahrenheit.  The garments were never laundered with bleach.  Mr. Combs also testified the Nomex garments were washed and dried only with other Nomex garments.  Mr. Combs testified that oil redeposition was a problem only with respect to Ameripride's windshield towels.  The evidence indicates Ameripride's laundering practices were consistent with VF Imagewear's and E.I. du Pont's instructions.  Despite the letter setting forth Buckner's potential theories of liability, no party has provided evidence that Ameripride used a wash formula not appropriate for Nomex.

There is no evidence cited by any party that Ameripride or Washing did or failed to do something that caused or contributed to Buckner's injuries.  At this time, no evidence has been found that either Ameripride or Washing's conduct in the cleaning of the lab coat created degradation.  The evidence that leads to the conclusion that the coat burned because it had been doused with gasoline and that the gasoline fumes and gasoline on the lab coat ignited due to the proximity of the nearby open flame.  Thus, at this time, the evidence indicates Ameripride's and Washing's liability is slight.

**B. Settlement Amounts**

Springfield has agreed to pay $100,000 to Buckner in order to settle all of Buckner's claims as to Springfield.

Ameripride has agreed to pay $500,000 to Buckner in return for a release of all claims as to Ameripride, including all liens, such as the Worker's Compensation lien of the State Compensation Insurance Fund.

Washing Systems has agreed to pay $100,000 to Buckner in return for a release of all claims as to Washing, to include all liens, such as the Worker Compensation lien and State

Compensation Insurance Fund.

**C. Proportionate Liability**

"[A] defendant's settlement figure must not be grossly disproportionate to what a reasonable person, at the time of the settlement, would estimate the settling defendant's liability to be." Torres v. Union Pacific R.R. Co., 157 Cal.App.3d 499, 509 (1984). The California Court of Appeal explained:

> For the damages are often speculative, and the probability of legal liability therefor is often uncertain or remote. And even where the claimant's damages are obviously great, and the liability therefor certain, a disproportionately low settlement figure is often reasonable in the case of a relatively insolvent, and uninsured, or underinsured, joint tortfeasor.

Stambaugh v. Superior Court, 62 Cal.App.3d 231, 238 (1976). One of the most important good faith settlement factors "is the settling party's proportionate liability" in that "if there is no substantial evidence to support a critical assumption as to the nature and extent of a settling defendant's liability, then determination of good faith based upon such assumption is an abuse of discretion." Toyota Motor Sales U.S.A., Inc. v. Superior Court, 220 Cal.App.3d 864, 871 (1990).

The burden of proof on the issue of good faith is on the non-settler who asserts that the settlement was not made in good faith. Cal.Civ.Pro. 877.6(d); Fisher v. Superior Court, 103 Cal.App. 434, 449 (1980).

*1. Springfield*

VF Imagewear in its opposition looks at a total possible award of $5,000,000, and concludes Buckner will be found at least 50% liable. VF Imagewear then argues Springfield could be found at least 20% liable. VF Imagewear has calculated Springfield's potential liability to be $1,300,000. Springfield's $100,000 settlement is only 2% of this potential verdict. Thus, VF Imagewear concludes the settlement is not in good faith. The problem with VF Imagewear's position is that it fails to supply evidence by which a trier of fact would find Springfield 20% liable. Another problem with VF Imagewear's calculation is that while

economic damages are joint, Buckner will only be able to collect them once.

Based on the lack of evidence developed at this point linking Buckner's damages with Springfield's design of the fabric or Springfield's failure to provide washing instructions and the probability of finding comparative negligence, Springfield's $100,000 settlement is not unreasonable or "out of the ballpark" under the circumstances.  A $100,000 settlement is within the ballpark of what a reasonable person would conclude Springfield's liability could be.

### 2. *Ameripride*

Using a total possible award of $5,000,000,  VF Imagewear argues Ameripride could be found at least 35% liable.   VF Imagewear has calculated Ameripride's potential liability to be $1,900,000.  Ameripride's $500,000 settlement is far less than this potential verdict.   The problem with VF Imagewear's position is that it fails to supply evidence by which a trier of fact would find Ameripride 35% liable.

Based on the lack of evidence developed at this point linking Buckner's damages with Ameripride's conduct in cleaning the lab coat and the probability of finding comparative negligence, Ameripride's $500,000 settlement is not unreasonable or "out of the ballpark" under the circumstances.   A $500,000 settlement is within the ballpark of what a reasonable person would conclude Ameripride's liability would be.

### 3. *Washing*

Using a possible award of $5,000,000, VF Imagewear argues Washing could be found at least 20% liable.   VF Imagewear has calculated Washing's potential liability to be $1,300,000. Washing's $100,000 settlement is only 2% of a potential verdict.    The problem with VF Imagewear's position is that it fails to supply evidence by which a trier of fact would find Washing 20% liable.

Based on the limited evidence that links Buckner's damages with Washing's conduct in cleaning the lab coat and the probability of finding comparative negligence, Washing's $100,000 settlement is not unreasonable or "out of the ballpark" under the circumstances.   A $100,000

16

settlement is within the ballpark of what a reasonable person would conclude Washing's liability could be.

**D. Other Factors**

There is no suggestion of collusion, fraud or tortuous conduct to injure VF Imagewear's interests. The proposed settlements were reached after extensive settlement negotiations, including a mediation by Retired Judge Russell Bostrom. Buckner was represented by counsel at all times. The settlement negotiations and mediation were conducted after numerous depositions were taken and substantial written discovery had been conducted. All evidence indicates the settlement was negotiated at arm's length. VF Imagewear was invited to participate in the mediation, but it declined.

The evidence does reveal that Ameripride's and Washing's insurance contains limits above the amounts of the settlements. It is unclear if Springfield's insurance contains limits above the amount of its settlement. However, given the problems discussed above to proving liability, the settlements are not out of the ballpark.

It is possible Buckner would obtain more from Ameripride, Washing, and Springfield at trial. However, Ameripride's, Washing's, and Springfield's pretrial settlement warrants a discount compared to a possible trial judgment.

No significant concerns appear as to the allocation of the settlement. VF Imagewear has failed to demonstrate the settlements lack good faith. The fact potential liability is extraordinarily high is insufficient to find the settlements are not in good faith in light of the limited evidence showing liability.

**ORDER**

Accordingly, based on the above memorandum opinion and order, the court ORDERS that:

1. Springfield's motion for a determination of good faith settlement is GRANTED;
2. Washing's motion for a determination of good faith settlement is GRANTED;

1      3.    Ameripride's motion for a determination of good faith settlement is GRANTED; and

4.    Buckner is ORDERED to file papers to dismiss Springfield, Ameripride, and Washing from this action within twenty days of this order's date of service.

IT IS SO ORDERED.

**Dated:     May 12, 2006**                               **/s/ Anthony W. Ishii**
0m8i78                                              UNITED STATES DISTRICT JUDGE

18